FILED

2013 FEB 28 PM 3: 58

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

Bennet Kelley (SBN 177001)
INTERNET LAW CENTER
100 Wilshire Blvd., Suite 950
Santa Monica, CA 90401
Telephone: (310) 452-0401
Facsimile: (702) 924-8740
bkelley@internetlawcenter.net

J. Daniel Hull (SBN 222862)
HULL MCGUIRE PC
1350 Columbia Street, 6th Floor
San Diego, CA 92101
Telephone: (619) 239-9400
Facsimile: (412) 261-2627
jdhull@hullmcguire.com

Attorneys for Global Wide Media, Inc.

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| GLOBAL WIDE MEDIA, INC.<br><br>       Plaintiff,<br><br>vs.<br><br>SEVADA BAGHOUMIAN, NEXTGEN MEDIA GROUP, INC., DING STEVEN SUN, MEDIAUPSTART, INC., and DOES 1-10, inclusive<br>       Defendants. | Case No.: CV12-7362-JAK (MANx)<br><br>GLOBAL WIDE MEDIA, INC.'S FIRST AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF FOR:<br><br>(1) RACKETEERING (18 U.S.C. §1961)<br>(2) MISAPPROPRIATION OF TRADE SECRETS (CAL. CIVIL CODE SECTION § 3426)<br>(3) UNFAIR COMPETITION (CAL. BUSINESS & PROFESSION CODE § 17200<br>(4) CONVERSION/EMBEZZLEMENT<br>(5) BREACH OF CONTRACT<br>(6) CONSTRUCTIVE TRUST<br><br>DEMAND FOR JURY TRIAL |

(42)

1    Plaintiff Global Wide Media, Inc. ("GWM") through its attorneys, brings

2    this complaint against Defendants Sevada Baghoumian, an individual; Next Gen

3    Media Group, Inc., a California corporation; Ding Steven Sun, an individual;

4    MediaUpstart, Inc., a California corporation and Does 1-10, inclusive and alleges as

5    follows:

6

7    **THE PARTIES**

8

9    1.   Plaintiff Global Wide Media, Inc. ("GWM"), is a California corporation

10   with its principal place of business in Westlake Village, California.

11   2.   Defendant Sevada Baghoumian ("Baghoumian") is an individual

12   residing in or about La Crescenta, California.   On information and belief,

13   Baghoumian is also known as Sevada Bandari.

14   3.   Defendant Next Gen Media Group, Inc. ("Next Gen"), is a California

15   corporation, doing business in or about La Crescenta, California.  Baghoumian is

16   President of Next Gen.

17   4.   Defendant Ding Steven Sun ("Sun"), is an individual residing in or

18   about Los Angeles, California.  Sun also does business as Sun Media and Media

19   Upstart.

20   5.   Defendant MediaUpstart, Inc. , is a California corporation doing

21   business in or about Glendale, California.  Sun is President of MUI.  MediaUpstart

22   was incorporated in October 2012 after this action had commenced, but for purposes

23   hereof the incorporated MediaUpstart and non-incorporated predecessor entities

24   controlled by Sun such as Media Upstart shall be referred to collectively as "MUI".

25   6.   GWM is informed and believes, and upon that basis alleges, that

26   Defendants Does 1-10 are entities or individuals who are residents in this judicial

27   district and are subject to the jurisdiction of this Court. The identities of the various

INTERNET LAW CENTER

1  Does are unknown to GWM at this time. Upon information and belief, said
2  fictitiously named defendants are liable to GWM on the basis of the same allegations
3  made herein against Defendants Baghoumian, Next Gen, Sun and MUI.  GWM will
4  seek leave to amend this Complaint to insert the true names and capacities when the
5  same are ascertained.

6
7  ## JURISDICTION AND VENUE

8      7.      This Court has original subject matter jurisdiction over the claims in
9  this action pursuant to 28 U.S.C. §1331 under the provisions of the Racketeer
10  Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq.  This Court
11  has jurisdiction over the claims in this action that arise under the law of the State of
12  California pursuant to 28 U.S.C. § 1367(a), because the state law claims are so
13  related to the federal claims that they form part of the same case or controversy and
14  derive from a common nucleus of operative facts.

15      8.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)
16  because all of the Defendants reside in the District; the activities by the Defendants
17  arose in, occurred within or were directed towards this jurisdiction; and the damage
18  sustained, occurred in the District.

19
20  ## FACTUAL BACKGROUND
21  ### *Global Wide Media Background*

22      9.      GWM was founded by the same management team that launched Hi-
23  Speed Media in 2001, an internet marketing and e-commerce venture that was
24  purchased by ValueClick for nearly $10 million two years later.

25      10.      In 2006 they launched GWM, an online affiliate marketing and internet
26  technology company that specializes in connecting advertisers with their targeted
27  audience through performance-based affiliate marketing and related services.  GWM

INTERNET LAW CENTER

provides online media services across all digital media channels (including display, email marketing, search engine marketing and social media) utilizing the latest technology to provide precise geo, behavioral, and lifestyle targeting.

11.    GWM focuses on branded marketing campaigns for many of the leading online advertisers and specializes in data management and optimization. Leveraging its cutting-edge technology, proprietary database, and management's significant experience within the online marketing industry, GWM is able to generate superior results for customers, resulting in strong market demand in North America, Latin America, Europe, and Asia.

12.    What begin as a small operation in Westlake Village, California has grown to a multi-national operation with offices in Canada, Europe and Asia that serves most major markets in the Americas, Europe and Asia.   One factor in this success has been that a number of its core employees have worked with management for nearly a decade or more.  In 2011, GWM was named one of the best places to work in greater-Los Angeles by the *Los Angeles Business Journal*.

### *Global Wide Media Business*

13.    GWM relies heavily on its proprietary contacts among both leading online retailers and service providers ("Advertisers") such as American Express, Discover, Direct TV, Disney, eHarmony, Netflix and T-Mobile and websites on which to advertise to generate traffic and results for the Advertisers ("Publishers").

14.    GWM has made substantial investments in building relationships with quality Advertisers and Publishers including, but not limited to, attending and exhibiting at leading industry trade shows in the United States, Europe and Australia.

15.    For each Advertiser and Publisher, GWM has negotiated a marketing commission model primarily based on cost-per action compensation ("CPA").

INTERNET LAW CENTER

Under this model, the Advertiser pays GWM a set amount each time an internet user visits the Advertiser's website and/or performs certain actions on the site (such as registering or making a purchase) and, where applicable, GWM in turn pays a defined commission to its Publishers.

16.    GWM's founders have years of experience in the online marketing industry that enables them to optimize Advertiser campaigns by finding the right mix of Publishers to yield maximum results for the Advertiser or campaign in question ("Campaign Optimization").

17.    GWM has kept the identity of its Advertisers and Publishers and compensation model and Campaign Optimization efforts for each strictly confidential.  The discovery of this information by GWM's competitors or use by a competitor would seriously harm GWM by allowing them to adjust pricing and better optimize their own campaigns as a result.

### *GWM Proprietary Agreement*

18.    For that reason, GWM requires that all employees execute the Global Wide Media Employee Proprietary Information and Inventions Agreement ("Proprietary Agreement"), under which each employee agrees, inter alia, that

a.    "at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the [GWM] and as directed by the [GWM], or to disclose to any person, firm or corporation without written authorization of the President of the [GWM], any Confidential Information of the [GWM] (as defined herein) [and] not to (i) copy, reverse engineer, decompile or dissemble any Confidential Information and (ii) remove or use any Confidential Information (or copies

INTERNET LAW CENTER

INTERNET LAW CENTER

1    thereof) outside the [GWM]'s offices unless with the written

2    authorization of the President of the [GWM]."

3    b.    "such Confidential Information constitutes a valuable asset of

4          [GWM];"

5    c.    while employed they "will not engage in any other employment,

6          occupation, consulting or other business activity directly related

7          to the business in which the [GWM] is now involved or becomes

8          involved during the term of my employment without written

9          authorization from the President of [GWM]" and acknowledge

10         that "any business opportunities related to [GWM]'s business

11         that [they] learn of or obtain while employed by [GWM]

12         (whether or not during working hours) belongs to [GWM] and

13         [that they] will pursue them only for [GWM]'s benefit";

14   d.    "at the time of leaving the employ of the [GWM], [they] will

15         deliver to the [GWM] (and will not keep in my possession,

16         recreate or deliver to anyone else) any and all devices, records,

17         data, notes, reports, proposals, lists, correspondence,

18         specifications, drawings, blueprints, sketches, materials,

19         equipment, other documents"; and

20   e.    during the term of their employment they shall not either directly

21         or indirectly . . .   "disparage [GWM] or its business, customers,

22         products or services"; or  (c) "interfere with [GWM]'s

23         relationships with its customers, employees, vendors, bankers

24         and others."

25

26

27

28

### *The Online Advertising Industry*

19.     When GWM's founders left the financial services industry to enter into the world of online advertising in 2000 it was an emerging $8 billion industry that accounted for less than four percent of all advertising dollars according to the IAB Internet Advertising Revenue report.  Today, it is a $34 billion industry that accounts for one in five advertising dollars spent in the United States.

20.     Like the technology industry in general, the online advertising industry is a young industry.   A recent study of technology companies such as Amazon, AOL, Apple, Facebook, and Google showed a median age range for employees of between 26 and 31-years old.   This presents a challenge to the industry since studies have suggested the presence of an "ethics gap" between Generation Y workers (such as Baghoumian and Sun) and their older counterparts, with the former demonstrating less loyalty to their employers and are more likely to use confidential information obtained from their employment.

### *Baghoumian and Sun Conspiracy*

21.     Before being hired by GWM in September 2008, Baghoumian had no prior experience with any internet company whatsoever, let alone experience in online advertising.

22.     GWM hired Baghoumian to serve as a Director of Data Optimization where he was responsible for allocating GWM's email inventory to those Advertisers yielding the best results.   In this role, Baghoumian primarily dealt with internal GWM personnel and would not normally have direct contact either with GWM's Advertisers or Publishers, although he would have access to data on both.

23.     Sun was hired by GWM as Director of Business Development in March 2011.  In this capacity, he was responsible for recruiting Advertisers and

INTERNET LAW CENTER

INTERNET LAW CENTER

1  Publishers to work with GWM and to optimize GWM's advertising campaigns for

2  maximum profitability among the Advertisers, Publishers and GWM.

3      24.    Both Baghoumian and Sun (collectively, "the Employee Defendants")

4  signed the GWM Proprietary Agreement, copies of which are attached as Exhibits

5  A and B respectively.

6      25.    Both Employee Defendants would have knowledge as to GWM's

7  Advertisers and Publishers including payout rates, conversion rates and Campaign

8  Optimization.

9      26.    In May 2011, Baghoumian organized and formed Next Gen. At this

10  time, Baghoumian began diverting business away from GWM and to Next Gen

11  and/or himself through existing GWM Advertisers and Publishers such as Peak

12  Interactive and RTK Media.

13      27.    Baghoumian also began making a steady torrent of disparaging

14  comments about GWM, its officers and his fellow employees on GWM's internal

15  chat mail system.

16      28.    On information and belief, Baghoumian recruited and/or encouraged

17  Sun to join him in diverting business from GWM.

18      29.    The Employee Defendants ran a scheme whereby, they profited, inter

19  alia, through

20          a.    sharing proprietary information with GWM advertisers and/or

21              publishers and their competitors;

22          b.    receiving payments for allocating GWM's ad inventory to run

23              campaigns for their clients;

24          c.    running GWM campaigns through entities they had a financial

25              interest in;

26          d.    diverting leads generated by or for GWM for their own purposes;

27              and

28

e.   soliciting GWM advertisers and/or publishers for their own campaigns.

30.   Employee Defendants conducted their business during normal working hours, using GWM's computers and other facilities for their own gain. At no time did they ever disclose their intention to engage in any such business nor did they ever receive consent from GWM to do so.

31.   Both Employee Defendants had substantial drops in performance and sales on behalf of GWM during the period they were engaging in their own business. GWM estimates that the drop in sales alone during this period exceeds $100,000.

32.   The scheme involved doing business with a number of GWM advertisers and/or publishers thereby diverting business that otherwise might have been generated by GWM from such parties, including the following:

a.   Bankrate, Inc., having a principal place of business in New York, New York;

b.   One Technologies, Inc., having a principal place of business in of Dallas, Texas;

c.   MediaTrust, having a principal place of business in Santa Monica, California;

d.   Peak Advertising having a principal place of business in Studio City, California; and

e.   RTK Media, LLC having a principal place of business in Colorado Springs, Colorado.

### Sharing Confidential Information

33.     In January 2012, Baghoumian and Sun both attended the Affiliate Summit conference in Las Vegas (which is one of the largest tradeshows covering affiliate marketing in the United States).

34.     At Affiliate Summit, the Employee Defendants met with the President of RTK Media ("RTK"), Richard Nolan ("Nolan").   Sun and Nolan were friends as Sun referred to Nolan as a "homie".  The Employee Defendants began working with RTK shortly thereafter through August 2012.

35.     Over the course of this period, Sun shared confidential information about GWM's advertising program with RTK via email.

36.     Similarly, in August and September 2011, Baghoumian shared highly proprietary information on the financial arrangements for one of GWM's ink advertisers via email in an attempt to get business from competing ink retailer(s).

37.     On information and belief, Sun and Baghoumian repeatedly exploited and/or shared GWM proprietary information for purposes of generating their own business with GWM's advertisers, publishers and third parties.

### Running GWM Campaigns Through Their Own Accounts

38.     On information and belief, Sun operated under the name Media Upstart and that as early as 2011 he was registered as an affiliate and/or advertiser with MediaTrust and possibly other ad networks.

39.     Sun profited from GWM ad campaigns by running them through his MediaTrust account.  On information and belief, Sun generated several thousand dollars in revenue each month with MediaTrust while employed by GWM.

INTERNET LAW CENTER

<strong>Running Their Own Advertising Campaigns</strong>

40.     In May 2011, Baghoumian approached Phil Rosenthal, President of GWM Advertiser Peak Interactive ("Peak") and offered to run their campaigns through Next Gen.   Peak agreed and thereafter ran their Webcoupons Daily, Groupon and Simply Inks campaigns through NextGen.

41.     On information and belief, the Employee Defendants have performed advertising services for other GWM clients including Bankrate and One Technologies.

<strong>Payments for GWM Inventory and Diversion of Resources</strong>

42.     The Employee Defendants allocated GWM's advertising inventory based on what would maximize gain to them and not necessarily what was in the best interest of GWM.

43.     RTK paid Sun through Media Upstart and Baghoumian through Next Gen monthly from February to August 2012 for including RTK campaigns in GWM's inventory.   RTK mailed checks payable to Media Upstart and NextGen for over $33,000 during this seven-month period.

44.     In June 2012, Baghoumian approached Peak and explained that due to his wedding he was in deep financial trouble but would run certain Peak campaigns through GWM in exchange for a kickback.   That month, Baghoumian ran a Disney Movie Club campaign for Peak through GWM, but instructed Peak via electronic communications to underreport the number of leads generated by GWM by a magnitude of 15 percent and to instead pay NextGen for this traffic.

<strong>Concealing and Covering Up the Conspiracy</strong>

45.     In order to conceal this relationship, Nolan provided instructions to Sun for the Employee Defendants to not identify themselves on Federal Express and/or

INTERNET LAW CENTER

other mailing labels. Sun relayed this information to Baghoumian via instant message.

46.     Sun and Baghoumian also took steps to conceal their operations by, for example, using Gmail and AOL email addresses or instant message services instead of their GWM accounts and taking client phone calls in GWM conference rooms or outside of GWM offices

47.     In late December 2012 or early January 2013, Roland Navarro de Ros, a former Vice President of Development with MediaTrust, informed Sun that he intended to speak with GWM about the case. Sun urged Mr. Navarro not to tell the "entire truth" to GWM.

48.     Once Mr. Navarro met with GMW and their counsel in early January 2013, Sun bombarded Navarro with telephone and text messages to intimidate him with respect to any cooperation in this matter.

### Termination of the Employee Defendants

49.     On August 6, 2012, GWM confronted Employee Defendants about their conduct.   Separately, each admitted (i) to engaging in unauthorized separate business operations while employed by GWM; (ii) working in concert with the other Employee Defendant; and (iii) to receiving payments from RTK.

50.     Each sought to "justify" their actions with Baghoumian claiming it was necessary due to a decline in his commissions, while Sun emphasized that the business was relatively small in scale. Sun did not see anything wrong with his conduct so long as he kept his embezzlement on a relatively small scale.

51.     Both employees were terminated that same day and both executed a certificate acknowledging their obligations under the Proprietary Agreements. The certifications provided, inter alia, that each would preserve as confidential all trade

secrets, confidential knowledge, data or other proprietary information relating to any business of the Company.

### *Post-Termination Activity*

52.    Within hours of termination, Baghoumian began contacting GWM's Advertisers and/or Publishers.  Upon information and belief, Baghoumian was using GWM proprietary information to identify the Advertisers and Publishers to contact.

53.    Sun recommended Baghoumian to his former employer and GWM competitor RateSpecial Interactive, LLC, which hired Baghoumian as an email-marketing manager and, on information and belief, he is and.or has used GWM proprietary information in the course of his employment.

54.    Sun continues to engage in business with GWM advertisers such as Bankrate and One Technologies and, on information and belief, is using GWM proprietary information to promote MUI.

55.    As a result of Baghoumian's and Sun's conduct, GWM has been substantially harmed and will suffer irreparable harm if both are not restrained from further violations of the Proprietary Agreement.

### FIRST CLAIM FOR RELIEF
### Against All Defendants
### *Racketeer Influenced and Corrupt Organizations Act*

56.    GWM hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

57.    Beginning in May 2011 and continuing until their termination in August 2012, the Employee Defendants began working in concert for the purpose of

INTERNET LAW CENTER

1    conducting their own business affairs while still employed by GWM, both

2    individually and through their business entities NextGen and MUI.

3        58.    The Defendants collectively constitute an association in fact, and/or

4    legal entity, and therefore an "enterprise," within the meaning of 18 U.S.C. §1961(5)

5    and were engaged in, and its activities affected interstate and foreign commerce,

6    within the meaning of RICO, 18 U.S.C. §1962(c).   The enterprise involved the

7    transmission of advertising services across the internet and involved publishers and

8    advertisers across the country. This was an ongoing enterprise that would have

9    continued indefinitely had it not been discovered by GWM.

10       59.    Each of these Defendants knew the essential nature and scope of the

11   enterprise or enterprise(s) that he, she, or it was employed by or associated with, and

12   each of the Defendants intended to participate in the affairs of the particular

13   enterprise or enterprise(s). In fact, the Employee Defendants regularly coordinated

14   their activities via the interoffice chat system.

15       60.    At all times relevant hereto, each Defendant conducted or participated

16   or maintained an interest in and/or conspired to conduct or participate or maintain an

17   interest in, directly or indirectly, in the conduct of enterprises' affairs through a

18   pattern of racketeering activity under 18 U.S.C. § 1961(5), thereby proximately

19   causing injury to Plaintiff under 18 U.S.C. §§1962(b) and 1962(c).

20

21                     ***Defendants Racketeering Activity***

22       61.    Each of the Employee Defendants engaged in fraud by (i) instructing its

23   advertisers to email false reports on the number of leads generated, while diverting

24   the leads to himself to themselves as Baghoumian did with in communications with

25   Phil Rosenthal of Peak Advertisement in June 2012 and, on information and belief

26   has done with other GWM clients such as Bankrate and OneTechnologies; and

27   (ii) continuing to receive compensation by direct deposit from GWM based on the

28

INTERNET LAW CENTER

INTERNET LAW CENTER

1    false pretense that they were and would continue to abide by GWM's terms of

2    employment.

3         62.    This fraud was conducted by means of telephone and electronic

4    communications such as the following in violation of 18 U.S.C. § 1343 (wire fraud):

5                      a.   Emailing invoices, such as the July 11, 2012 invoice to Peak

6                          Advertising for payment to NextGen for leads generated by GWM;

7                      b.   Emailing and/or faxing insertion orders for Defendant Employees

8                          business operations such as campaigns for Simply Ink and Groupon

9                          sent on or about May 17, 2011 and Disney Movie Club sent on or

10                         about June 14, 2011.

11                    c.   Ongoing telephonic communications with RTK by the Defendant

12                          Employees regarding campaigns run on their behalf from February

13                          to August 2012.

14                    d.   Similar communications with other GWM advertisers and publishers

15                          by the Defendant Employees.

16         63.    This fraud was conducted by means of the Postal Service and/or

17    interstate mail carriers in violation of 18 U.S.C. § 1341 (mail fraud) as payments

18    were mailed to NextGen and MUI, including but not limited to monthly payments by

19    RTK to each beginning February 6, 2012 and continuing until August 3, 2012 and

20    payments made by Peak to NextGen in 2011.

21         64.    Employee Defendants' conduct in diverting and trafficking in leads

22    generated by GWM for their own account and for payment to NextGen and MUI,

23    such as with Peak in June 2012 and, on information and belief, other GWM

24    advertisers and/or publishers violates the National Stolen Property Act, 18 U.S.C. §

25    2314.

26         65.    Defendant's Sun conduct in requesting that Mr. Navarro withhold

27    information regarding his business relationship with MediaTrust and subsequent acts

28   

of harassment constitute an attempt to influence, delay or prevent testimony in this matter in violation of 18 USC § 1512 (witness tampering).

66.     GWM has been injured in its business and/or property by reason of Defendants' unlawful conduct.

## SECOND CLAIM FOR RELIEF
### *Against All Defendants*
### Misappropriation of Trade Secrets

67.     GWM hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

68.     GWM keeps the identities of its Advertisers and Publishers, their compensation and how to optimize campaigns using its pool of Advertisers and Publishers strictly confidential.   GWM uses reasonable methods under the circumstances to maintain the secrecy of its confidential information.

69.     GWM derives independent economic value, actual or potential, from its confidential information not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.

70.     As a result of GWM's efforts to keep its confidential information secret and as a result of the independent economic value GWM derives from this information, the information constitutes a trade secret, as that term is defined under California Civil Code Section 3426.1(d).

71.     The non-Employee Defendants acquired GWM's trade secrets while knowing or having reason to know that the trade secrets had been acquired by improper means; and having used improper means to acquire knowledge of the trade secrets.

INTERNET LAW CENTER

72.     Defendants disclosed or used GWM's trade secrets without GWM's consent, while knowing or having reason to know that the trade secrets had been derived from or through a person who had utilized improper means to acquire them and/or were derived from or through a person who owed a duty to GWM to maintain their secrecy.

73.     Employee Defendants engaged in this misconduct as an agent of Next Gen, MUI and/or Doe Defendants.

74.     As a result of Defendants' misconduct, GWM has been substantially harmed.

75.     There is no adequate remedy at law for the harm that GWM suffered and continues to suffer as a result of Defendants' misconduct. Thus, GWM requests injunctive and equitable relief.

76.     The acts described above were done willfully and malicious and with an intent to inflict harm upon GWM.

## THIRD CLAIM FOR RELIEF

### *Against All Defendants*

### Unfair Competition

77.     GWM hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

78.     Defendants have engaged in unlawful business acts or practices by committing illegal actions, including computer fraud and theft of trade secrets as alleged above, in an effort to gain unfair competitive advantage over GWM.

79.     The acts and conduct of Defendants constitute fraudulent, unlawful, and unfair competition as defined by California Business & Professions Code Section 17200 et seq.

INTERNET LAW CENTER

80.   Defendants have improperly and unlawfully taken commercial advantage of GWM's investments in its trade secrets.   In light of Defendants conduct it would be inequitable to allow Defendants to retain the benefit of the funds obtained through the unauthorized and unlawful use of its trade secrets.

81.   As a result of such unfair competition, GWM has also suffered irreparable injury and, unless Defendants are enjoined from such unfair competition, will continue to suffer irreparable injury, whereby GWM has no adequate remedy at law.

82.   Defendants should be compelled to restore any and all money or property they may have obtained in violation of California Business & Professions Code Section 17200 et seq., and should be enjoined from further unlawful, unfair and deceptive business practices.

## FOURTH CLAIM FOR RELIEF

### *Against Employee Defendants*
### Conversion/Embezzlement

83.   GWM hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

84.   Employee Defendants, without authorization, converted leads generated on behalf on GWM's Advertisers by GWM for their own purposes.   The unauthorized use by Employee Defendants has deprived GWM of the legitimate use of this commercially valuable asset and caused GWM to suffer damages as a result.

85.   Employee Defendants committed the acts described above intentionally, maliciously in an oppressive manner and in conscious disregard of GWM's rights.

INTERNET LAW CENTER

INTERNET LAW CENTER

## FIFTH CLAIM FOR RELIEF

### *Against Employee Defendants*

### <u>Breach of Written Contract</u>

86.     GWM hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

87.     Each Employee Defendant executed the GWM Proprietary Agreement.

88.     The Agreement is valid, binding contract, supported by adequate consideration.

89.     Each Employee Defendant signed an acknowledgement upon their termination that would continue to adhere to the terms of the GWM Proprietary Agreement.

90.     Each Employee Defendant breached the GWM Proprietary Agreement by using GWM confidential information for their own commercial gain and by engaging in a competing business both without prior consent from GWM.

91.     In addition, Baghoumian further breached the GWM Proprietary Agreement by using GWM confidential information post-termination  for purposes of competing with GWM.

92.     GWM has fulfilled all of its obligations under the Proprietary Agreement.

93.     The Employee Defendants' Actions constitute material breaches of the GWM Proprietary Agreement.

94.     There is no adequate remedy at law for the harm that GWM has suffered and continues to suffer as a result of the Employee Defendants' misconduct.

INTERNET LAW CENTER

**SIXTH CLAIM FOR RELIEF**

*Against All Defendants*

<u>**Constructive Trust**</u>

95.    GWM hereby re-alleges and incorporates by reference the allegations contained in the preceding paragraphs as if set forth fully herein.

96.    On information and belief, the Defendants own and/or possess tangible real and/or personal properties and assets, including, but not limited to, bank, savings, and/or other financial accounts, consisting of and/or obtained by profit derived from Defendants' unauthorized and illegal conduct set forth herein.

97.    GWM is entitled to the profits derived from such conduct.

98.    GWM has no adequate remedy at law and has suffered irreparable harm and damage as a result of Defendants' acts.  Defendants hold those tangible real and/or personal properties and assets consisting of and/or obtained by profit derived from Defendants' illegal conduct as constructive trustees for the benefit of GWM, in an amount thus far not determined.

<u>**PRAYER FOR RELIEF**</u>

WHEREFORE, GWM demands entry of a judgment against the Defendants as follows:

1.    That this Court enter findings that the Defendants have engaged in the conduct alleged herein;

2.    That Defendants, their agents, servants, employees, representatives, successors and assigns, and persons, firms or corporations in active concert or participation with said Defendants be immediately and permanently enjoined from

using or disseminating GWM trade secrets and either return and/or certify under oath that they do not possess any GWM trade secrets;

3.   That GWM be awarded damages for Defendants' unlawful conduct including (i) profits derived from the use of GWM's trade secrets; (ii) losses sustained by GWM as a result of Defendants conduct; (iii) punitive damages and (iv) treble damages pursuant to 19 U.S.C. § 1961 et seq.;

4.   That Defendants account for and pay over to GWM all damages sustained by GWM and profits realized by Defendants by reason of their unlawful actions herein alleged which is believed to be in excess of $100,000;

5.   That Defendants are holding, as constructive trustees for the benefit of GWM, any and all personal and/or real properties and assets consisting of and/or obtained by profits derived from Defendants' unlawful activity and that GWM be granted possession of these properties;

6.   That GWM recover its costs of this action together with reasonable attorneys' fees, expenses and prejudgment interest.

7.   That Defendants within thirty days after the service of the judgment herein, be required to file with this Court and serve upon Plaintiffs' attorneys, a written report under oath setting forth in detail the manner in which they have complied with the judgment;

//

//

INTERNET LAW CENTER

8.    That the Court grant GWM such other and further relief as it deems just and equitable to make GWM whole for the damage caused by Defendants.

Dated: February 28, 2013                    Respectfully submitted,

                                            INTERNET LAW CENTER

                                            BY _____

J. Daniel Hull                              Bennet G. Kelley
HULL MCGUIRE PC                             100 Wilshire Blvd, Suite 950
1350 Columbia Street, 6th Floor             Santa Monica, CA 90401
San Diego, CA 92101

                                            Attorneys for
                                            Plaintiff Global Wide Media, Inc.

# EXHIBIT A

# GLOBAL WIDE MEDIA
## EMPLOYEE PROPRIETARY INFORMATION
## AND INVENTIONS AGREEMENT

The following confirms an agreement between me and Global Wide Media, Inc. (the "Company"), which is a material part of the consideration for my employment by the Company.

1.   Company Information.

a.   I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company and as directed by the Company, or to disclose to any person, firm or corporation without written authorization of the President of the Company, any Confidential Information of the Company (as defined herein). I further agree not to (i) copy, reverse engineer, decompile or dissemble any Confidential Information and (ii) remove or use any Confidential Information (or copies thereof) outside the Company's offices unless with the written authorization of the President of the Company. I acknowledge that such Confidential Information constitutes a valuable asset of Company.

b.   I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment. Confidential Information includes information developed by me, alone or with others as part of my employment with Company. I understand that this Agreement does not limit my right to use my own general knowledge and experience whether or not gained while employed by Company, or my right to use information that is or becomes generally known to the public through no fault of my own, but I have the burden in any dispute of showing that such information is not Confidential Information of the Company.

c.   In the event that I receive a request from any governmental, regulatory or self-regulatory agency or are required (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose all or any part of the Company's Confidential Information, I agree to (i) immediately notify the Company of the existence, terms and circumstances surrounding such a request, (ii) consult with Company on the advisability of taking legally available steps (at the Company's sole cost and expense) to resist or narrow such request; and (iii) assist the Company in seeking a protective order or other appropriate remedy (at the Company's sole cost and expense). In the event that such a protective order or other remedy is not obtained, I may disclose to any requesting person or tribunal only that portion of the Confidential Information that I in good faith believe to be legally required and shall use my best efforts to obtain assurances that the Confidential Information will be treated as confidential information.

2.   Third Party Information. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for

certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3. _Assignment of Inventions._ I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "Inventions"), except as provided in Section 3(d) below. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectible by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

   a. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

   b. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application of any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

   c. I have attached hereto as Exhibit A complete list of all existing Inventions to which I claim ownership as of the date of this Agreement and that I desire to specifically clarify are not subject to this Agreement, and I acknowledge and agree that such list is complete.

   d. I understand that the provision of this Agreement requiring assignment of Inventions to the Company do not apply to any invention that qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B). I will advise the Company

Employee Proprietary Information And Inventions Agreement
Page 2

promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A.

4. <u>Conflicting Employment</u>. I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of my employment without written authorization from the President of Company. I understand that any business opportunities related to Company's business that I learn of or obtain while employed by Company (whether or not during working hours) belongs to Company and I will pursue them only for Company's benefit.

5. <u>Return of Company Documents</u>. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns. In the event of the termination of my employment, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C.

6. <u>Solicitation of Employees, Disparagement or Interference</u>. I agree that so long as am employed by Company and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly (a) solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity; (b) disparage Company or its business, customers, products or services; and (c) interfere with Company's relationships with its customers, employees, vendors, bankers and others.

7. <u>Reasonableness</u>. I acknowledge that the terms of this Agreement are reasonably necessary to protect Company's legitimate business interests. I acknowledge that, if my employment with Company ends, my experience and capabilities are such that I can obtain employment that does not violate this agreement, and that an injunction to enforce this agreement will not prevent me from earning a reasonably livelihood.

8. <u>At-Will Employment</u>. I agree that this Agreement is not an employment agreement, does not set forth all the terms and conditions of my employment nor does it alter my at-will employment status. I have the right to resign and the Company the right to terminate my employment at any time.

9. <u>Representations</u>. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

10. <u>Arbitration and Equitable Relief</u>.

a. Arbitration. EXCEPT AS PROVIDED IN SECTION 10(b) BELOW, I AGREE

Employee Proprietary Information And Inventions Agreement
Page 3

THAT ANY DISPUTE OR CONTROVERSY ARISING OUT OF, RELATING TO, OR CONCERNING ANY INTERPRETATION, CONSTRUCTION, PERFORMANCE OR BREACH OF THIS AGREEMENT, SHALL BE SETTLED BY ARBITRATION BEFORE A SINGLE ARBITRATOR TO BE HELD IN LOS ANGELES, CALIFORNIA, IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION. THE ARBITRATOR MAY GRANT INJUNCTIONS OR OTHER RELIEF IN SUCH DISPUTE OR CONTROVERSY. THE DECISION OF THE ARBITRATOR SHALL BE FINAL, CONCLUSIVE AND BINDING ON THE PARTIES TO THE ARBITRATION. JUDGMENT MAY BE ENTERED ON THE ARBITRATOR'S DECISION IN ANY COURT HAVING JURISDICTION. THE COMPANY SHALL PAY THE COSTS AND EXPENSES OF SUCH ARBITRATION, AND EACH OF US SHALL SEPARATELY PAY OUR COUNSEL FEES AND EXPENSES. THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE EMPLOYER/EMPLOYEE RELATIONSHIP (EXCEPT AS PROVIDED IN SECTION 9(b) BELOW), INCLUDING, BUT NOT LIMITED TO, THE FOLLOWING CLAIMS:

i.   ANY AND ALL CLAIMS FOR WRONGFUL DISCHARGE OF EMPLOYMENT; BREACH OF CONTRACT, BOTH EXPRESS AND IMPLIED; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BOTH EXPRESS AND IMPLIED; NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENT OR INTENTIONAL MISREPRESENTATION; NEGLIGENT OR INTENTIONAL INTERFERENCE WITH CONTRACT OR PROSPECTIVE ECONOMIC ADVANTAGE; AND DEFAMATION;

ii.   ANY AND ALL CLAIMS FOR VIOLATION OF ANY FEDERAL, STATE OR MUNICIPAL STATUTE, INCLUDING, BUT NOT LIMITED TO, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE CIVIL RIGHTS ACT OF 1991, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE FAIR LABOR STANDARDS ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, AND LABOR CODE SECTION 201, et seq.; and

iii.   ANY AND ALL CLAIMS ARISING OUT OF ANY OTHER LAWS AND REGULATIONS RELATING TO EMPLOYMENT OR EMPLOYMENT DISCRIMINATION.

b.   Equitable Remedies. I AGREE THAT IT WOULD BE IMPOSSIBLE OR INADEQUATE TO MEASURE AND CALCULATE THE COMPANY'S DAMAGES FROM ANY BREACH OF THE COVENANTS SET FORTH IN SECTIONS 1, 2, 3, 4, 5 and 6 HEREIN. ACCORDINGLY, I AGREE THAT IF I BREACH ANY OF SUCH SECTIONS, THE COMPANY WILL HAVE AVAILABLE, IN ADDITION TO ANY OTHER RIGHT OR REMEDY AVAILABLE, THE RIGHT TO OBTAIN AN INJUNCTION FROM A COURT OF COMPETENT JURISDICTION RESTRAINING SUCH BREACH OR THREATENED BREACH AND TO SPECIFIC PERFORMANCE OF ANY SUCH PROVISION OF THIS AGREEMENT. I FURTHER AGREE THAT NO BOND OR OTHER SECURITY SHALL BE REQUIRED IN OBTAINING SUCH EQUITABLE RELIEF AND I HEREBY CONSENT TO THE ISSUANCE OF SUCH INJUNCTION AND TO THE ORDERING OF SPECIFIC PERFORMANCE.

c.   Consideration. I UNDERSTAND THAT EACH PARTY'S PROMISE TO

RESOLVE CLAIMS BY ARBITRATION IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT, RATHER THAN THROUGH THE COURTS, IS CONSIDERATION FOR OTHER PARTY'S LIKE PROMISE. I FURTHER UNDERSTAND THAT I AM OFFERED EMPLOYMENT IN CONSIDERATION OF MY PROMISE TO ARBITRATE CLAIMS.

11. Miscellaneous.

a. Governing Law; Consent to Personal Jurisdiction. This Agreement will be governed by the laws of the State of California. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Los Angeles County California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

b. Entire Agreement. This Agreement and Exhibits A, B and C sets forth the entire Agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this agreement, will be effective unless in writing signed by the President of the Company and myself. Any subsequent change or changes in duties, salary or compensation will not affect the validity or scope of this Agreement.

c. Severability. If one more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

d. Survival. I agree that my obligations under Sections 1, 2, 3, 5 and 6 of this Agreement shall continue in effect after termination of my employment, regardless of the reason(s) for my termination and whether such termination is voluntary or involuntary on my part and that the Company is entitled to communicate my obligations under this Agreement to any future employer, potential employer of mine or other third parties as is necessary to protect Company's rights hereunder.

e. Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

ACCEPTED AND AGREED TO:

GLOBAL WIDE MEDIA, INC.                    EMPLOYEE

_____                    _____
Signature                                  Signature

FRANK EMPAO                                Sarada Baghmanian
_____                    _____
Print Name                                 Print Name

Dated: 09/15/08

Exhibits A, B and C attached.

Employee Proprietary Information And Inventions Agreement
Page 5

# EXHIBIT B

# GLOBALWIDE MEDIA
## EMPLOYEE PROPRIETARY INFORMATION
## AND INVENTIONS AGREEMENT

The following confirms an agreement between me and Global Wide Media, Inc. (the "Company"), which is a material part of the consideration for my employment by the Company.

1.  Company Information.

a.  I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company and as directed by the Company, or to disclose to any person, firm or corporation without written authorization of the President of the Company, any Confidential Information of the Company (as defined herein). I further agree not to (i) copy, reverse engineer, decompile or dissemble any Confidential Information and (ii) remove or use any Confidential Information (or copies thereof) outside the Company's offices unless with the written authorization of the President of the Company. I acknowledge that such Confidential Information constitutes a valuable asset of Company.

b.  I understand that "Confidential Information" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly in writing, orally or by drawings or observation of parts or equipment. Confidential Information includes information developed by me, alone or with others as part of my employment with Company. I understand that this Agreement does not limit my right to use my own general knowledge and experience whether or not gained while employed by Company, or my right to use information that is or becomes generally known to the public through no fault of my own, but I have the burden in any dispute of showing that such information is not Confidential Information of the Company.

c.  In the event that I receive a request from any governmental, regulatory or self-regulatory agency or are required (by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose all or any part of the Company's Confidential Information, I agree to (i) immediately notify the Company of the existence, terms and circumstances surrounding such a request, (ii) consult with Company on the advisability of taking legally available steps (at the Company's sole cost and expense) to resist or narrow such request; and (iii) assist the Company in seeking a protective order or other appropriate remedy (at the Company's sole cost and expense). In the event that such a protective order or other remedy is not obtained, I may disclose to any requesting person or tribunal only that portion of the Confidential Information that I in good faith believe to be legally required and shall use my best efforts to obtain assurances that the Confidential Information will be treated as confidential information.

2.  Third Party Information. I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for

certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3. <u>Assignment of Inventions</u>. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "Inventions"), except as provided in Section 3(d) below. I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectible by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

a. I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

b. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application of any United States or foreign patents or copyright registrations covering inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

c. I have attached hereto as Exhibit A complete list of all existing Inventions to which I claim ownership as of the date of this Agreement and that I desire to specifically clarify are not subject to this Agreement, and I acknowledge and agree that such list is complete.

d. I understand that the provision of this Agreement requiring assignment of Inventions to the Company do not apply to any invention that qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B). I will advise the Company

Employee Proprietary Information And Inventions Agreement
Page 2

promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A.

4.  Conflicting Employment. I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business in which the Company is now involved or becomes involved during the term of my employment without written authorization from the President of Company. I understand that any business opportunities related to Company's business that I learn of or obtain while employed by Company (whether or not during working hours) belongs to Company and I will pursue them only for Company's benefit.

5.  Return of Company Documents. I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns. In the event of the termination of my employment, I agree to sign and deliver the "Termination Certification" attached hereto as Exhibit C.

6.  Solicitation of Employees, Disparagement or Interference. I agree that so long as am employed by Company and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly (a) solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity; (b) disparage Company or its business, customers, products or services; and (c) interfere with Company's relationships with its customers, employees, vendors, bankers and others.

7.  Reasonableness. I acknowledge that the terms of this Agreement are reasonably necessary to protect Company's legitimate business interests. I acknowledge that, if my employment with Company ends, my experience and capabilities are such that I can obtain employment that does not violate this agreement, and that an injunction to enforce this agreement will not prevent me from earning a reasonably livelihood.

8.  At-Will Employment. I agree that this Agreement is not an employment agreement, does not set forth all the terms and conditions of my employment nor does it alter my at-will employment status. I have the right to resign and the Company the right to terminate my employment at any time.

9.  Representations. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

10. Arbitration and Equitable Relief.

  a.  Arbitration. EXCEPT AS PROVIDED IN SECTION 10(b) BELOW, I AGREE

THAT ANY DISPUTE OR CONTROVERSY ARISING OUT OF, RELATING TO, OR CONCERNING ANY INTERPRETATION, CONSTRUCTION, PERFORMANCE OR BREACH OF THIS AGREEMENT, SHALL BE SETTLED BY ARBITRATION BEFORE A SINGLE ARBITRATOR TO BE HELD IN LOS ANGELES, CALIFORNIA, IN ACCORDANCE WITH THE RULES THEN IN EFFECT OF THE AMERICAN ARBITRATION ASSOCIATION. THE ARBITRATOR MAY GRANT INJUNCTIONS OR OTHER RELIEF IN SUCH DISPUTE OR CONTROVERSY. THE DECISION OF THE ARBITRATOR SHALL BE FINAL, CONCLUSIVE AND BINDING ON THE PARTIES TO THE ARBITRATION. JUDGMENT MAY BE ENTERED ON THE ARBITRATOR'S DECISION IN ANY COURT HAVING JURISDICTION. THE COMPANY SHALL PAY THE COSTS AND EXPENSES OF SUCH ARBITRATION, AND EACH OF US SHALL SEPARATELY PAY OUR COUNSEL FEES AND EXPENSES. THIS ARBITRATION CLAUSE CONSTITUTES A WAIVER OF EMPLOYEE'S RIGHT TO A JURY TRIAL AND RELATES TO THE RESOLUTION OF ALL DISPUTES RELATING TO ALL ASPECTS OF THE EMPLOYER/EMPLOYEE RELATIONSHIP (EXCEPT AS PROVIDED IN SECTION 9(b) BELOW), INCLUDING, BUT NOT LIMITED TO, THE FOLLOWING CLAIMS:

  i. ANY AND ALL CLAIMS FOR WRONGFUL DISCHARGE OF EMPLOYMENT; BREACH OF CONTRACT, BOTH EXPRESS AND IMPLIED; BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BOTH EXPRESS AND IMPLIED; NEGLIGENT OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; NEGLIGENT OR INTENTIONAL MISREPRESENTATION; NEGLIGENT OR INTENTIONAL INTERFERENCE WITH CONTRACT OR PROSPECTIVE ECONOMIC ADVANTAGE; AND DEFAMATION;

  ii. ANY AND ALL CLAIMS FOR VIOLATION OF ANY FEDERAL, STATE OR MUNICIPAL STATUTE, INCLUDING, BUT NOT LIMITED TO, TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, THE CIVIL RIGHTS ACT OF 1991, THE AGE DISCRIMINATION IN EMPLOYMENT ACT OF 1967, THE AMERICANS WITH DISABILITIES ACT OF 1990, THE FAIR LABOR STANDARDS ACT, THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT, AND LABOR CODE SECTION 201, et seq.; and

  iii. ANY AND ALL CLAIMS ARISING OUT OF ANY OTHER LAWS AND REGULATIONS RELATING TO EMPLOYMENT OR EMPLOYMENT DISCRIMINATION.

  b. Equitable Remedies. I AGREE THAT IT WOULD BE IMPOSSIBLE OR INADEQUATE TO MEASURE AND CALCULATE THE COMPANY'S DAMAGES FROM ANY BREACH OF THE COVENANTS SET FORTH IN SECTIONS 1, 2, 3, 4, 5 and 6 HEREIN. ACCORDINGLY, I AGREE THAT IF I BREACH ANY OF SUCH SECTIONS, THE COMPANY WILL HAVE AVAILABLE, IN ADDITION TO ANY OTHER RIGHT OR REMEDY AVAILABLE, THE RIGHT TO OBTAIN AN INJUNCTION FROM A COURT OF COMPETENT JURISDICTION RESTRAINING SUCH BREACH OR THREATENED BREACH AND TO SPECIFIC PERFORMANCE OF ANY SUCH PROVISION OF THIS AGREEMENT. I FURTHER AGREE THAT NO BOND OR OTHER SECURITY SHALL BE REQUIRED IN OBTAINING SUCH EQUITABLE RELIEF AND I HEREBY CONSENT TO THE ISSUANCE OF SUCH INJUNCTION AND TO THE ORDERING OF SPECIFIC PERFORMANCE.

  c. Consideration. I UNDERSTAND THAT EACH PARTY'S PROMISE TO

RESOLVE CLAIMS BY ARBITRATION IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT, RATHER THAN THROUGH THE COURTS, IS CONSIDERATION FOR OTHER PARTY'S LIKE PROMISE. I FURTHER UNDERSTAND THAT I AM OFFERED EMPLOYMENT IN CONSIDERATION OF MY PROMISE TO ARBITRATE CLAIMS.

11. <u>Miscellaneous</u>.

a.   Governing Law; Consent to Personal Jurisdiction. This Agreement will be governed by the laws of the State of California. I hereby expressly consent to the personal jurisdiction of the state and federal courts located in Los Angeles County California for any lawsuit filed there against me by the Company arising from or relating to this Agreement.

b.   Entire Agreement. This Agreement and Exhibits A, B and C sets forth the entire Agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this agreement, will be effective unless in writing signed by the President of the Company and myself. Any subsequent change or changes in duties, salary or compensation will not affect the validity or scope of this Agreement.

c.   Severability. If one more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

d.   Survival. I agree that my obligations under Sections 1, 2, 3, 5 and 6 of this Agreement shall continue in effect after termination of my employment, regardless of the reason(s) for my termination and whether such termination is voluntary or involuntary on my part and that the Company is entitled to communicate my obligations under this Agreement to any future employer, potential employer of mine or other third parties as is necessary to protect Company's rights hereunder.

e.   Successors and Assigns. This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

**ACCEPTED AND AGREED TO:**

**GLOBAL WIDE MEDIA, INC.**                **EMPLOYEE**

_____                _____
Signature                                              Signature

_____                _____
Print Name                                            Print Name
                                                               Steven Sun

Dated: 3-2-11

**Exhibits A, B and C attached.**

Employee Proprietary Information And Inventions Agreement
Page 5